**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**PARKERSBURG DIVISION**

ORIN S. JOHNSON., et al.,

                Plaintiffs,

v.                                          CIVIL ACTION NO.  6:08-cv-00313

SAMUEL B. ROSS, II

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the court is defendant Samuel Ross's Motion for Summary Judgment [Docket 125].  As explained below, the Motion is **GRANTED**.

**I. Background**

    *A.  Facts*

This case arises out of the defendant's allegedly improper use of the plaintiffs' intellectual property.  The parties are completely diverse, and the amount in controversy exceeds $75,000.  The court therefore possesses jurisdiction under 28 U.S.C. § 1332.

        *1.  The Technology*

In 1995, plaintiffs Orin Johnson and Gary Jones, residents of Minnesota, developed a new technology in the fenestration (window-making) industry.  The technology involved a welding process by which the corners of a thermoplastic window frame could be welded together using radiant heat instead of a flash (the "flash-free welding technology").  The flash-free welding technology had the potential to substantially increase the efficiency of window-frame production.

Johnson and Jones received two patents with regard to the flash-free welding technology in 1995.[1] They assigned ownership of their patents to plaintiff Am-Rad, Inc., a Minnesota corporation.

Plaintiff Millennium Marketing Group, Ltd. ("Millennium"), a Kansas corporation, served as the marketing agent for Johnson, Jones, and Am-Rad. In 2004, Millennium negotiated a potential business venture with two West Virginia corporations, Simonton Building Products, Inc. and Simonton Holdings, Inc. (collectively, "Simonton"). Simonton manufactured custom-made vinyl windows and doors. It was "owned and controlled" by defendant Samuel Ross, a West Virginia resident. (Compl. ¶ 13.)

### 2. *The License Agreement*

On April 8, 2004, Millennium—acting on behalf of Johnson, Jones, and Am-Rad— entered into a "Non-Disclosure and Non-Use Agreement" with Simonton Building Products. They agreed "to protect any and all confidential and proprietary or trade secret information exchanged between the parties regarding the [flash-free welding technology]" and that neither party would "employ for [its] own purposes . . . the confidential and proprietary information belonging to the other party." (*Id.* ¶ 14.)

Then, on November 21, 2004, Millennium, Am-Rad, Johnson, Jones, and Simonton entered into a License Agreement (the "License Agreement"), granting Simonton a two-year exclusive license to utilize the flash-free welding technology to develop new fenestration-related

---

[1] One patent was entitled "Clamping Head for Use in Joining Plastic Extrusions and Method Thereof"; the other was entitled "Deflashing Head and Method for Joining Plastic Extrusions." The U.S. Patent and Trademark Office numbers for these patents are 5,855,720 and 5,902,447, respectively.

technologies.[2]  The License Agreement provided for two potential revenue streams to the plaintiffs. The plaintiffs would receive payment from Simonton for the license itself.[3]  But, more substantially, they would also profit from a joint venture with Simonton created by the License Agreement (the "joint venture").  The joint venture had "the sole purpose of marketing and selling to others the right to use the Flash-Free Welding Technology in the fenestration industry, specifically manufactured doors and windows." (License Agreement 7-8.)  Simonton agreed to "contribute to the capital of the [joint venture] any enhancements or additional patents it may acquire as the result of placing into production products using the Flash-Free Welding Technology." (*Id.* at 7.)  The Licensing Agreement also addressed infringement, sublicensing, and enforcement of the contract.  It provided that all successors in interest to the parties would be bound by the terms of the agreement.[4]

After entering into the License Agreement, Johnson and Jones "jointly developed and tested the technologies" and "contributed their patented technology, in addition to fixtures, heat plates, drawings, information pertaining to the time, temperature, and distance settings for the welding process, as well as other confidential, proprietary information and know-how." (Compl. ¶ 19.)  In particular, a new technology—"Precision Control Welding Technology"—was developed through the joint venture that was based on the flash-free welding technology (the "new welding technology"). The plaintiffs claim to have consulted with Simonton "both on the telephone and in person numerous times during the development process." (*Id.*)  They allege that "[d]uring all such

---

[2]  The License Agreement is found at Docket 125, Exhibit A, at 21.

[3]  Simonton paid the plaintiffs $565,000 for the license.  (Johnson Dep. 166:17-169:12.)

[4]  The parties amended the License Agreement on July 15, 2005, altering the scheme by which Simonton could extend the flash-free welding technology license.

efforts, Simonton and Ross fostered and nurtured the feelings of trust and confidence and the notion that [the parties] were 'in it together.'" (*Id.*)

### 3. The Alleged Misconduct

Simonton was a subsidiary of SBR, Inc. ("SBR"), a West Virginia corporation founded in 1972. SBR had been "a highly successful holding company and valuable business enterprise with subsidiaries operating nationwide and in China." (Def.'s Mem. Supp. Mot. Summ. J. 3.) SBR owned several subsidiaries, including Simonton. Ross was the "principal founder and leader," director, chairman, and chief executive officer of SBR. (*Id.* at 3-4.) He was also chairman of Simonton's board, as well of the boards of "most of SBR's other subsidiaries." (*Id.* at 4.)

Ross states that prior to a regularly scheduled board meeting on August 26, 2005, he had been concerned about potential decline in the building-products sector of the economy, and that he and SBR's chief financial officer discussed the possibility of marketing SBR for sale. Fortune Brands, Inc. ("Fortune Brands") was an Illinois corporation that appeared interested in acquiring SBR. Ross asserts that management presented a valuation of SBR to the board at the August 25, 2006 board meeting and that the board "decided that Ross should contact Fortune Brands to determine whether that entity had an interest in acquiring SBR and, if so, Ross should endeavor to obtain an offer for the Board to consider." (*Id.* at 5.) In November 2005, SBR sent a formal offering memorandum to Fortune Brands, and, in December 2005, representatives of Fortune Brands and SBR met to discuss the SBR subsidiaries. Fortune Brands made an initial offer to buy SBR on December 13, 2005, contingent on due diligence and board approval. (Klein Dep. 20:3-8, 63:5-20; Van de Sype Dep. 24:6-10, 27:25-28:6.)

On December 30, 2005, Simonton filed two patent applications with the U.S. Patent and Trademark Office for the new welding technology. The first was entitled "Method & Apparatus for Window Manufacture," and the second was entitled "Fenestration Product and Method & Apparatus for Manufacture." The patent applications did not list Johnson or Jones as inventors. The plaintiffs allege that "the Simonton Patent Applications disclose[d] and propose[d] claims that [we]re enhancements or improvements to the [Flash-free welding technology]," which "violate[d] the terms of the License Agreement." (Compl. ¶ 24.)

Fortune Brands began conducting due diligence on SBR in January 2006. (Van de Sype Dep. 28:14-23, 30:21-24, 33:18-23.) According to a Fortune Brands executive, it was "really important" to Fortune Brands to "figur[e] out [whether SBR had] some new technology . . . that would enable some cost-savings or price increase for a vinyl window." (*Id.* at 58:13-59:3.) According to the plaintiffs, in February 2006 when the plaintiffs allegedly learned of the transaction between Fortune Brands and SBR, Simonton representatives assured the plaintiffs that the joint venture would proceed and that Simonton's new patents would belong to the joint venture. (Pls.' Resp. Mot. Summ. J. 10-11.)

On June 7, 2006, Fortune Brands acquired 100% of SBR's outstanding stock for $595 million.[5] Ross asserts that "[a]t least 60% of the consideration was paid in Fortune Brands' stock which was restricted against sale for two years pursuant to SEC requirements." (Def.'s Mem. Supp. Mot. Summ. J. 8.)

---

[5] The actual transaction involved several steps. Fortune Brands created Brightstar Acquisition LLC ("Brightstar"), and Brightstar merged into SBR on June 7, 2006. Then, on June 9, 2009, SBR merged into SBR, LLC. SBR's shareholders approved the mergers. (Ross Dep. 22:3-11.) SBR's shareholders received consideration for their shares from Fortune Brands. (*Id.* at 25:6-26:24.)

*B. Procedural History*

On May 14, 2008, Millennium, Am-Rad, Johnson, and Jones filed the Complaint, alleging two causes of action against Ross: breach of fiduciary duty and unjust enrichment. According to the plaintiffs, in selling SBR to Fortune Brands, "Simonton and Ross touted the [flash-free welding technology] to Fortune Brands . . . and was thereby able to negotiate a significantly higher price for the Simonton entities . . . than Ross would otherwise have received." (Compl. ¶ 26.)

On August 12, 2009, the Complaint was amended. Millennium was terminated as a plaintiff, the breach-of-fiduciary-duty claim was dismissed, and the plaintiffs dropped their demand for punitive damages. The Complaint as amended left Am-Rad, Johnson, and Jones as plaintiffs, with a single claim against Ross for unjust enrichment. On October 23, 2009, the defendant filed the Motion for Summary Judgment. The plaintiffs filed a Response on October 30, 2009, and the defendant filed a Reply on November 4, 2009.[6]

## II. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the facts and the inferences to be drawn from them in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). A genuine issue of

---

[6] In addition to this litigation, the plaintiffs have filed suit against Simonton Building Products, Simonton Holdings, and Fortune Brands in federal court in Kansas. *Johnson, et al. v. Simonton Building Prod., Inc.*, No. 08-cv-2198 (D. Kan. 2008). Their complaint in that case, filed on April 30, 2008, alleges four claims against Simonton only: breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, breach of the License Agreement, and breach of the Non-Disclosure and Non-Use Agreement. It asserts two claims against Fortune Brands only: tortious interference with contract and tortious interference with business relationships and business expectancy. And the complaint lodges two claims against both Simonton and Fortune Brands: aiding and abetting and unjust enrichment.

material fact exists if reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### III. Discussion

The only remaining claim in this case is the unjust enrichment claim against Ross. The plaintiffs contend that they licensed the flash-free welding technology to Simonton in order to develop new technology for marketing and sale in the fenestration industry. But, the plaintiffs allege, after the joint venture developed the new welding technology, Simonton did not contribute the capital earned from new welding technology back to the joint venture. Instead, they maintain, Ross claimed the new welding technology as his own and then sold it as a part of his company to Fortune Brands. By "using [the plaintiffs'] Confidential and Trade Secret Information in order to sell [SBR] to Fortune Brands," the plaintiffs argue, Ross received more money in the deal with Fortune Brands than he would have without the new welding technology. (Compl. ¶ 29.) The plaintiffs contend that Ross has been unjustly enriched by his actions, and that they are entitled to restitution for "the increased value Ross received in the sale of his entities and assets to Fortune Brands" from the new welding technology. (*Id.* ¶ 40.)

Ross argues that he is entitled to judgment as a matter of law and seeks summary judgment on two fronts. First, he contends that the plaintiffs' unjust enrichment claim is barred by the License Agreement. Second, he argues that he cannot be held liable as a shareholder for acts that he took on behalf of Simonton.

    *A. The License Agreement Bars the Unjust Enrichment Claim*

Unjust enrichment, or quantum meruit, is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2s 1060, 1062 (Del. 1988); *Thompson v. Merchant's & Mechanics' Bank of Wheeling*, 3 W. Va. 651 (1869) (recognizing unjust enrichment cause of action in West Virginia). Unjust enrichment is an equitable, rather than legal, claim for relief. It is a court-developed theory of relief intended to be employed in the absence of a formal contract. *See Freedman v. Beneficial Corp.*, 406 F.Supp. 917, 923 (D. Del. 1975) (detailing development of unjust enrichment). Because legal remedies are favored over equitable remedies, a formal contract governing the subject matter at issue precludes an unjust enrichment claim. The Supreme Court of Appeals of West Virginia has explained that "[a]n express contract and an implied contract, relating to the same subject matter, can not co-exist." *Case v. Shepherd*, 84 S.E.2d 140, 144 (W. Va. 1954); *Rosenbaum v. Price Const. Co.*, 184 S.E. 261, 263 (W. Va. 1936); *see also Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979) ("Because the contract is the measure of plaintiffs' right, there can be no recovery under an unjust enrichment theory independent of it.").

Ross contends that the License Agreement is an express contract governing this subject matter, and therefore the unjust enrichment claim cannot stand as a matter of law. "[U]nder the License Agreement," Ross argues, "Simonton purchased the right to use the Flash-Free Welding Technology and any improvements thereto, for the life of the patents." (Def.'s Reply ¶ 5.) Thus, he maintains, "whether Plaintiffs seek damages . . . under the License Agreement or a separate oral . . . agreement, the subject matter is the same[:] failure to form a Joint Venture and contribute the patents for the New Welding Technology to it." (*Id.* ¶ 7.)

The plaintiffs assert that the unjust enrichment claim is not founded in the License Agreement, but rather in Ross's extra-contractual actions. They contend that "[t]he License Agreement imposed no requirements on the Plaintiffs whatsoever to share their confidential and proprietary information . . . or to otherwise join in the development of the Am-Rad Flash-Free Technology or the resulting precision controlled welding technology." (Pls.'s Resp. Mot. Summ. J. 14.) Thus, they assert, their "unjust enrichment claim derives from the Defendant requesting [the plaintiffs'] services, confidential and proprietary information . . . [,] which resulted in the jointly developed precision controlled welding technology, not from the License Agreement." (*Id.*) Because the express terms of the License Agreement do not cover the same subject matter as that complained of in the unjust enrichment claim, they maintain, their claim is not precluded.

Here, the plaintiffs' unjust enrichment claim is precluded because an express contract governs this identical subject matter. The plaintiffs entered into the License Agreement with Simonton. Under that agreement, Simonton was required to contribute gains from any new technology developed from the license to the joint venture. But after developing the new welding technology, the plaintiffs assert, Ross claimed the new welding technology as his own and then sold his company at an increased profit. The crux of the plaintiffs' claim is that Simonton (through Ross) violated the terms of the License Agreement. Indeed, the plaintiffs' own characterization of the facts undermine their contention that this is not a contract claim. The Complaint states that *"[p]ursuant to the Licence Agreement and the terms of the parties' joint venture*, Simonton was required to contribute to the capital of the joint venture any enhancements or additional patents it may acquire as the result of placing into production products utilizing the [flash-free welding technology] that incorporate the claims of the [flash-free welding technology], and improvements thereto." (Compl.

¶ 23 (emphasis added).) In light of an express agreement between the parties covering this same subject matter, the plaintiffs' claim for equitable relief cannot stand.

### B. Ross is Not Liable as a Shareholder of Simonton

Even if the plaintiffs were able to pursue an action for unjust enrichment, Ross would not be subject to liability. A corporation is a distinct legal entity from its shareholders, and shareholders are generally not liable for the corporation's acts. *Laya v. Erin Homes, Inc.*, 352 S.E.2d 93, 97 (W. Va. 1986). This distinction between corporation and shareholder "is a fiction of the law introduced for purpose of convenience and to subserve the ends of justice." *Syl. pt. 10, Sanders v. Roselawn Mem. Gardens, Inc.*, 159 S.E.2d 784 (W. Va. 1968). The corporate veil attaches to all corporations, even those having just a single shareholder. *S. Elec. Supply Co. v. Raleigh County Nat'l Bank*, 320 S.E.2d 515, 524 (1984) ("[W]e cannot disregard a corporation solely because it has one or two, and the same, shareholders.").

In some circumstances, however, piercing the corporate veil may be necessary. "Justice may require that courts look beyond the bare legal relationship of the parties to prevent the corporate form from being used to perpetrate injustice, defeat public convenience or justify wrong. However, the corporate form will never be disregarded lightly." *S. States Coop., Inc. v. Dailey*, 280 S.E.2d 821, 827 (W. Va. 1981). West Virginia employs a "totality of the circumstances" test to determine whether the corporate veil should be pierced in any particular case. *Laya*, 352 S.E.2d at 99 (providing nineteen factors to consider in deciding whether to pierce the corporate veil).

In this case, the plaintiffs assert that Ross was not acting on behalf of the corporation and that he is therefore not entitled to shield himself with the corporate form. They assert that their claim

-10-

is not based upon a breach of the corporation's obligations, but rather upon Ross's improper conduct on behalf of himself and the other SBR shareholders.

Despite the plaintiffs' characterization of Ross's role in the relationship between Simonton and the plaintiffs, it is clear that Ross was acting on behalf of the corporation. The plaintiffs' sole basis for holding Ross liable is that "in negotiating the sale of SBR to Fortune Brands, the Defendant was acting on his own behalf and on behalf of the other SBR shareholders." (Pls.' Resp. Mot. Summ. J. 20.) The mere fact that Ross acted in his own self interest, however, does not necessarily mean that he was not acting on behalf of the corporation. Ross was the chairman and chief executive officer of SBR. He held similar positions at Simonton. As such, Ross had a fiduciary duty to SBR and Simonton to act in the best interest of those corporations. The facts reveal that Ross saw an opportunity to sell SBR at a time that would benefit both companies. The mere fact that he stood to profit from this transaction is of no avail. Corporate officers often own stock in companies they serve. Owning stock in a corporation incentivizes officers to act in the corporation's interest. Ruling that a corporate officer is personally liable for an act taken on behalf of the corporation solely because he is also a major shareholder would turn corporate law on its head.

Having determined that Ross was acting on behalf of Simonton, there is no evidence suggesting that the corporate veil should be pierced in this case. Indeed, the plaintiffs do not advance such an argument. None of the nineteen factors identified by the Supreme Court of Appeals of West Virginia are implicated in this case. *See Laya*, 352 S.E.2d at 99. Undoubtedly, Ross was a driving force behind SBR and Simonton. He founded both companies and held senior positions in both companies. He had a substantial role in the transactions with the plaintiffs. But these facts,

standing alone, are not enough to pierce the corporate veil. *See S. Elec. Supply Co.*, 320 S.E.2d at 524. As such, there are no grounds for holding Ross liable.

### IV. Conclusion

The plaintiffs' unjust enrichment claim fails as a matter of law. The court thus **GRANTS** Ross's Motion for Summary Judgment [Docket 125]. The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: December 10, 2009

Joseph R. Goodwin, Chief Judge